**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF WEST VIRGINIA**

**UNITED STATES OF AMERICA,**

**v.**                                         **Criminal Action No: 1:08CR21**

**DAVID CAMERON,**
             **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

On the 15th day of April, 2008, came the defendant, David Cameron, in person and by L. Richard Walker, his attorney, and also came the United States by its Assistant United States Attorney, David Perri, for a hearing on Defendant's Motion to Suppress, which motion was filed on April 3, 2008 [Docket Entry 17].

## I. Procedural History

A grand jury attending the United States District Court for the Northern District of West Virginia returned a one-count indictment against defendant on March 5, 2008. Said indictment charges Defendant with Possession of Child Pornography, and includes a Forfeiture Allegation. Defendant was arraigned on March 17, 2008, and entered a plea of "Not Guilty." On April 3, 2008, Defendant filed his Motion to Suppress [Docket Entry 17]. This matter was referred to the undersigned United States Magistrate Judge for Report and Recommendation by District Judge Irene M. Keeley by Order entered April 10, 2008 [Docket Entry 18]. The United States filed its Response to the Motion on April 14, 2008 [Docket Entry 20].

In his Motion, Defendant moves the Court to suppress "all physical evidence and other evidence obtained as a result of the unconstitutional seizure of his person." The undersigned conducted an evidentiary hearing on April 15, 2008.

## II. Contentions of the Parties

A.  Defendant contends he was detained by the police at the Taylor County Public Library; that there was an insufficient basis for his initial detention; and this unlawful detention rendered inadmissible all evidence obtained in this case.

B.  The Government contends:   1) The situation involved a consensual encounter between the police and the defendant, and there was therefore no detention; and 2) Even if the encounter had not been consensual, the officers would have been justified in detaining the defendant for the purpose of investigating the nature and purpose of his behavior.

### III.  Testimony

During the suppression hearing, the undersigned  received the testimony of four witnesses under oath, to wit: City of Grafton Police Officer David Matheny; City of Grafton Police Officer Christopher Erdie; City of Grafton Police Sergeant David Holcomb; and Defendant David Cameron. The Court also received three exhibits in evidence, these being marked as Defendant's Exhibits A and B, and Government's Exhibit 1, which are Sgt. Holcomb's Affidavit in Support of Search Warrant, Sgt. Holcomb's police report,  and a photograph of Defendant, respectively.

The following is a witness by witness synopsis of the testimony presented.

### A.  Officer Matheny

Grafton City Police Officer David Matheny testified that he had been a police officer since October 2005, the entirety of his police work being with the City of Grafton.  On August 22, 2007, he was at the police station getting ready for his shift, when a call came in from a staff member at the  Taylor County Public Library.  This call came directly to the police department and was not a 911- type call.  The caller stated that there was a male at the library taking pictures of a child over the objection of the child's mother.

The library was approximately two miles from the police station. Officer Matheny told his supervisor, Sergeant Holcomb, about the call. Sgt. Holcomb told Matheny to go over to the library and obtain more information. Officer Matheny left immediately, taking Officer Erdie, a trainee, with him. They both traveled in Officer Matheny's police vehicle, a Jeep Cherokee.

Once inside the library, Officer Matheny saw two male subjects, one on the right and one on the left, both sitting at library tables. Officer Erdie went to talk with the child's mother. He came back and told Officer Matheny that the man on the right was the one who had been taking the pictures. He said the mother had pointed him out.

Officer Matheny saw Defendant sitting at a table looking on his laptop computer. As the two officers approached, Defendant closed his laptop. It did not appear to Officer Matheny that he had shut the computer off, but just closed it. Officer Matheny thought it suspicious that Defendant just closed the laptop, because it made it appear that there might be items on the laptop he "shouldn't be looking at."

Officer Matheny asked Defendant if he had been taking pictures of a child after being told not to, and Defendant said "no," he had not. Officer Matheny then called Sgt. Holcomb and told him what had happened. Sgt. Holcomb advised him to "ask if he [Defendant] wanted to come to the police department."

When counsel again asked what had been said, Officer Matheny testified that he asked Defendant, "Was he taking pictures of a child, and the mother asked you not to?" and Defendant said he was not. Matheny testified that he had understood that a child had told her mother Defendant did take pictures of her, and she told her mother he asked if he could and she told him "no." Officer Matheny did not think a little girl would be able to make that up.

Officer Matheny testified that he told Defendant, "ok," and called Sgt. Holcomb. He again testified that Sgt. Holcomb advised him to ask Defendant to go with him and Officer Erdie to the police station. He testified that he said to Defendant, "My sergeant would like to speak with you. Would you come with us down to the station?" He testified that Defendant immediately started putting his belongings away, and said, "Sure, where are we going?" Defendant did not hesitate, did not protest, and showed no reluctance.

When asked yet again, Officer Matheny stated he was very clear on asking Defendant if he would like to come to the police department. He did not say or suggest that Defendant had no choice. He did not lay hands on the defendant, did not try to grab any of Defendant's possessions, and did not tell Defendant to pack his belongings. Defendant did that on his own.

Officer Matheny testified that, on their way to the police department, Defendant had not been searched and was not handcuffed, and was sitting in the back of his cruiser "fiddling around with his bag," at which time Officer Matheny said to Defendant, "Please do not touch your bag." He testified that was the only other thing he said to Defendant, and the only instruction he gave Defendant. He said he did that because he had not searched the Defendant or his bag at the library or outside of the car and he did not want Defendant to go inside of the bag for fear there might be something inside that could be used as a weapon.

They rode the few blocks from the library to the police department in approximately two to three minutes. Defendant sat in the back passenger area. There was no "cage" in that area. At the station, Officer Matheny unlocked the door for Defendant and he got out. The car was equipped with child safety door locks that automatically lock when the car starts moving.

At the hearing, Officer Matheny viewed a photograph of Defendant and identified him, but

testified that the photograph was taken after Defendant went to the Regional Jail and showered. When he first saw Defendant at the library he was "a little more drastic" than in the photograph. He was a large man, overweight, at 307 pounds, and looked "untaken-care-of," with very bushy hair and a very bushy beard. His hair was uncombed. He had very bad body odor. After Defendant left Officer Matheny's police vehicle, the officer "had to clean it, the smell was still there."

Upon cross-examination, Officer Matheny testified he first talked to Sgt. Holcomb immediately after the telephone call from the library staffer. The caller said an individual at the library was taking pictures of a child without her permission. Sgt. Holcomb told him to "Go over and see what's going on." No statements were made by Sgt. Holcomb to Officer Erdie before they left. The call from the library was considered by him to be a "non-emergency." When the officers got to the library, Officer Erdie went and spoke with the girl's mother but not any of the library employees. Erdie came back and told Matheny the man taking the photos was "setting over there and he was the one taking pictures." The two officers began to walk toward Defendant, and Defendant immediately closed his laptop. Both officers were in uniform and wearing sidearms.

Officer Matheny testified on cross-examination that he asked Defendant if he had been taking any pictures after being asked not to, and Defendant said "no." Officer Matheny did not hear Officer Erdie speak with Defendant at all. Officer Matheny again testified that he then called Sgt. Holcomb and told him what had happened. He asked Sgt. Holcomb if there was anything more for them to do. He testified that he usually asked for, and followed Sgt. Holcomb's instructions when he, himself, was not sure what to do. When asked directly by counsel for Defendant whether he detained Defendant, Matheny testified, no, he did not detain Defendant; no, Sgt. Holcomb did not instruct him to detain Defendant; and no, Sgt. Holcomb did not instruct him to bring Defendant to

the police department.  He also testified that when he instructed Defendant while in the police cruiser to stop fiddling with his things, Defendant complied.  Defendant did not ever try to get to his own vehicle; did not try to walk to the station; and did not try to put his belongings in any other vehicle.  Defendant went with the officers willingly.  They did not tell Defendant to pack up his things or to bring his things with him.  Instead, Defendant packed his things up himself and said, "Where we going?"

Officer Matheny testified he did not know Defendant's car was in the parking lot, and he was not aware of any time that Defendant tried to put his property in his own or any other vehicle.  He and Officer Erdie were with Defendant  the entire time.  Counsel for Defendant asked Officer Matheny what would have happened it Defendant had just walked away, to which Officer Matheny testified he would have called Sgt. Holcomb again and asked for more guidance.  Meanwhile, however, Defendant wasn't detained, wasn't in cuffs, and was not, in fact, detained.

Officer Matheny testified that he spoke with a library employee during that first telephone call, who said that a male subject was taking pictures of a child.  He was not sure if he was told at that time that the mother had told the man not to take pictures.  Matheny had no recording of the event and no contemporary notes.  He simply told Sgt. Holcomb what had happened.  When the staffer called, she or he did not seem urgent, just curious.  The mother, not the staffer, had wanted them to come.

Officer Matheny testified there were 4-5 minutes between the original phone call and when they arrived at the library.  Matheny also testified that Defendant had a camera sitting on the table in front of him.  He testified that Officer Erdie went to the mother and talked to her a minute or two.  The mother had been standing inside the door waiting for them.  He said she walked over to the fish

tank and tried to show Officer Erdie what Defendant did, but Officer Erdie came back to Officer Matheny, and Matheny never spoke with the woman. After Erdie came back, they approached Defendant, and said, "Sir, was [sic] you the one taking pictures of the little child and she told you not to?" Defendant said "no." Matheny then called Sgt. Holcomb, who told him to ask Defendant if he would come to the station. He said he was doing another investigation and would like to speak with Defendant. He believed Holcomb said, "Ask him if he would be able to come speak with me. I'm pretty tied up now with this investigation." Matheny then told Defendant, "The Sgt. would like to speak with you, and if you would, he would like you to come over the police department to speak with him." Defendant packed up his belongings and said, "Sure, where we going?" The officers walked out with Defendant. They did not speak until Defendant was in the back seat going through his things, and Matheny told him to stop. Later he testified that he had said, "Hey my car's over here, and I'd like you to sit on the passenger side in the back seat." He did not recall asking Defendant's name, and did not recall asking him for any ID. He did not recognize Defendant; had no prior connection with Defendant; and had no experience with any cases involving child pornography, in particular in Grafton or Taylor County.

Once at the station, Matheny placed Defendant in a room beside the office, saying, "You can go back there and sit till Sgt. Holcomb speaks with you, if you want." The door was open. No one went into the room with Defendant. Defendant was not searched, and his belongings were not searched. He was not detained, "he was not nothing." Nobody even looked in his things. Matheny told Holcomb that Defendant was there. Holcomb told Matheny to get a "consent to search form" to see if, in fact, Defendant had been taking pictures. Matheny got the consent form and Defendant signed it.

**B.  Officer Erdie**

Grafton Police Officer Christopher Erdie testified he had been a police officer for about 1 ½ years, always with the City of Grafton.  On August 22, 2007, he was at the station right at the shift change.  He had just walked in when Officer Matheny told him there was a call from a library employee that a male individual was taking pictures of children.  Matheny asked Erdie to accompany him to the library.  They left right away in Matheny's police vehicle.

Officer Erdie testified the two walked into the library where they made contact with the child's mother.  She had been standing in the front doors, and when they arrived, motioned for them to come over.  Erdie asked her who was taking pictures, and she motioned toward Defendant.  He then went back and told Matheny, and the two officers walked toward Defendant, who was sitting at tables by the window.  Defendant closed his laptop computer as they approached.  Matheny asked Defendant, "Were you taking pictures of any children?" to which Defendant replied, "No."  Erdie was not overly concerned because he did not really know what was going on.  Defendant had a laptop, digital camera, and case on the table.  Officer Matheny then phoned Sgt. Holcomb.  Erdie did not talk to or ask any questions of Defendant, but just stood there.  Matheny had called Holcomb to "see what needed to possibly be done or asked, before we leave."

Officer Erdie testified neither officer ever ordered Defendant to do anything; never laid hands on Defendant; never suggested Defendant was not free to leave; never suggested he was required to talk to them; and never restrained Defendant or prevented him from leaving.  Defendant never tried to leave.  The conversation between Holcomb and Matheny took about three to five minutes.  Matheny then asked Defendant "if he would mind coming to the office to speak with the Sergeant."  Defendant immediately began packing up and then walked with the officers toward their

car.  Defendant was calm throughout.  They did not ask him to pack up his stuff.  He did that on his own.  They did not speak any further with the mother.  Officer Erdie testified that no one had  shown him the fish tank or where the alleged complained-of activity took place.  When asked again, Erdie testified that Defendant closed the laptop as they began walking toward him.  They had no conversation with library staff.

Upon cross examination by Defendant's counsel, Erdie testified that after Matheny got off the phone with Holcomb, Matheny said something to the Defendant, to the effect of "Would you mind coming to the police department to talk with our sergeant?"  Erdie  did not recall the specific words.  The officers did not tell Defendant he did not have to come.  Defendant went with them voluntarily.  Defendant did not try to drive his own car or walk to the station.

Erdie testified that, once inside the police station, they told Defendant where to go, and Defendant followed their specific instructions.  The room was an interview room.  They asked him to sit in that back room.  The door remained open at all times.  Erdie testified that "if [Defendant] walked away, no, they would not get him.  They had no reason to, he had nothing on him."  "Ask him if he would come," was what Officer Matheny said Sgt. Holcomb had said.  Defendant packed up and brought his things with him to the vehicle.  He did not attempt to put his things anywhere else, and did not attempt to walk away or walk in any other direction.

## C.  Sgt. Holcomb

Sgt. David Holcomb testified he had been a police officer for 17 or 18 years.  Part of that time he had been with the Taylor County Sheriff's Office.  He had been a sergeant with the Grafton City Police for three years. He was familiar with the area and the people living there, as he had lived in that area for 25 years.

Sgt. Holcomb testified that on August 22, 2007, he was at the police station when Officer Matheny took a call from the library reporting that someone at the library was taking unwanted photos of children. He directed Matheny to take the call and see what was going on. At the time Sgt. Holcomb was working on "the Vannoy case" in which an arrest had been made and a search warrant initiated only days earlier. The case involved child pornography charges. Vannoy was a resident of Grafton and the search warrant was executed at his residence. When Sgt. Holcomb heard there was a complaint about an individual trying to take unwanted pictures of a little girl at the library, it sent up a "red flag." He had worried during the Vannoy case that there were others in the area involved with Vannoy, sharing child pornography. He did not share any of his concerns with the other officers, Matheny and Erdie, however.

Officers Matheny and Erdie went to the library to "see what was going on." Later, Matheny called him from the library and told him what was happening there. Sgt. Holcomb testified that Matheny told him an individual was taking pictures of a little girl even after being told not to. The individual had a laptop and digital camera. Sgt. Holcomb testified he instructed Matheny to "see if he [Defendant] would come over and talk to him." The situation scared Holcomb, because the individual could be downloading pictures onto his laptop, and could even be waiting to abduct the child or follow her home later. He again testified he told Matheny to "Just ask him to come over." A short time later, they arrived. When asked specifically if he had instructed Matheny to detain Defendant, Holcomb testified he told Matheny to "see if he would come over and talk to us," not to detain him.

Counsel for the United States then pointed out to Holcomb that in his sworn affidavit in support of search warrant he used the word "detain," and asked if he was aware of that. Counsel

showed Holcomb the affidavit, and Holcomb said, "I see that." He then testified that the word "detain" was just a "poor word choice."

Upon cross examination, Sgt. Holcomb testified that he had no specific training or experience in child pornography cases until the Vannoy case. He knew other people in the area were involved with Vannoy, and when he heard someone was taking unwanted pictures of a child, it sent up a "red flag" – "let's go find out what's going on." He said he "really needed to speak with [the individual]" to see if he was involved. Counsel for Defendant then pointed out that Holcomb, in his sworn affidavit, had written "Patrolman Matheny was instructed to detain [Defendant] and bring him to the police station." He also wrote, "he was detained." Holcomb testified that Defendant was never handcuffed and everything he did was of his "own free will." Defendant was in a room with the door open. He agreed that was <u>not</u> what he had written in the affidavit. He agreed the affidavit was different, but again stated that the word "detain" in the affidavit was just a "poor word choice."

Counsel for Defendant then showed Holcomb his Report of Investigation, a separate document, in which Holcomb stated, "this officer . . . advised to detain for investigative purposes." Holcomb said he did draft that Report, as the Lead Investigating Officer in the case.

Regarding the Vannoy case, Holcomb believed, from correspondence found in the search, that Vannoy had a personal relationship with at least one known sex offender in the area. He believed that people who had a sexual relationship would share the same interests. One individual with whom Vannoy associated had been arrested for child pornography. Holcomb also believed that people who liked the same thing shared them, and there must be people in the area who shared the pornography with Vannoy. He had no specific evidence that Vannoy would be in any way

associated with someone at the Taylor County Library, just that he was associated with a man arrested for child pornography in nearby Barbour County. He also knew there was a man taking pictures of a child after being asked not to.

Holcomb testified that the caller said Defendant had asked the child if he could take her picture, and the child said no. He took the picture anyway, and the child went to her mother. After Defendant signed the consent to search form, Holcomb spoke with the mother. She said the incident had scared her, especially because she had heard about the Vannoy case.

The Court then asked Holcomb if he had personal knowledge of the phone call from the library, or only what he was told by Matheny. Holcomb testified he knew only what Matheny told him. The Court asked if there was anything in his mind before Matheny went to the library, regarding the mother telling Defendant not to take the pictures, or not being happy with him taking the pictures. Holcomb testified that he believed he was told Defendant continued to take pictures after he was told not to. The court asked Holcomb if he wrote down the events as they happened, or afterward. Holcomb testified that he began writing within 24 hours so there would be some documentation, but the information was inputted in a "piecemeal" fashion.

## D.  Defendant, David Cameron

Defendant, David Cameron, testified he was at the library on August 22, 2007, when two men entered the library and approached him. He had his briefcase and computer laptop on the table. His camera was not on the table. It was in the briefcase in a special compartment. He had put it in there so he would not forget it, as he was 56 years old and didn't remember everything. The camera was never in view. He had put it in the briefcase after taking two pictures of the aquarium. The men told him to close his laptop, unplug it, put it in its case, and go with them. He did not close the

laptop until the men ordered him to do so.

Defendant testified he did not remember the men being in uniform, and did not recognize either of the testifying officers. He just knew they said to "come with them." He had no choice but to do so. He was not told he did not have to go with them. He had been in the military for 20 years, and knew what an order was when he heard one, and obeyed it.

Defendant testified that when he walked out of the library with the two men, he opened his own car door and put his laptop computer in his car behind the driver's front seat. One of the men then told him to take it back out of the car and to follow them to their car. He testified he had had "no option." It was "definitely an order." When asked if he followed the men, Defendant replied, "Of course." He "had no choice." They told him to get into the car. He got in the back seat and they closed the door. At some point he realized he had closed his laptop without turning it off. He was afraid the battery might run out so he opened his briefcase to turn it off. At that time one of the men told him to close the briefcase and close everything up. He did. It was an order.

Defendant testified he had no idea where they were going until they arrived at the Grafton Fire Department. It was only later that he found out the bottom floor of the fire department building was the police department. He was escorted into a room and told to sit at a table. The men asked for his digital cell phone.

Upon cross examination, Defendant testified that when the two men arrived he was checking his email on his laptop computer. He was sitting at a table. He looked up, over the laptop screen, and saw two men walk in. He did not know the two men were police officers. To this day, he "still [doesn't] know they were police officers." To him they were two strangers, possibly in plainclothes, who ordered him to do things. They didn't force him, and he didn't see any guns. They did give

him orders, however, and after 20 years in the military, he followed orders.  He only knew that two

men came in and told him to shut down and unplug his laptop, put it in the briefcase, and follow

them.  They appeared to be people in authority.  They acted like they were in authority, so it was

"only reasonable" for him to get up and follow them out.  He did not know where they were going.

He only knew he was "placed under somebody's authority and they wanted to take him someplace."

He testified that a the time he thought, "What the heck? A new adventure," and that he "had nothing

else to do."  He never saw a gun.  It was possible the two strangers were in uniform with jackets

covering them up, but they appeared to be wearing brown dress suits like the attorneys or the Deputy

United States Marshal present at the hearing were wearing.  It was "fair to say" they looked like

"agents."  They looked like they "had authority."  They ordered him to do what they said.  He did

not remember if the two strangers were the same people as the two officers who testified at the

hearing.

Defendant again testified that his camera was not on the table in the library, as he had put

it away in the briefcase so he would not forget it.  He disagreed with the officers' testimony that the

camera was on the table.  Defendant testified he only took two pictures, one of the front of the

aquarium and one of the back.  He did not know what else may have been "captured" in the photos,

because he never saw them after taking them.

Defendant testified the two men did not tell him where they were going, and he did not know

where they were going until they arrived at the fire department, which he only later learned was also

the police department.  He did not remember anything about the vehicle he rode in except that he

believed he put on his seatbelt.  He did not even remember the color of the vehicle.  He was not told

where he was going or why.  He did put his laptop in his own vehicle first, but got it back out when

told to.  He "had no idea what it was about."  When asked if there was anything Defendant thought he might be in trouble for, Defendant testified:

> I'm not sure.  People do things weird all the time.  It's been my experience that people do weird things.  You watch television and things like this happen all the time.  Officers, FBI agents come up and drag you off.

Defendant testified that he was not handcuffed and the men did not put their hands on him except to help him out of the car at the fire department.  The men never identified themselves, never said they were police officers, and never asked him anything in the library.  He was not sure what his state of mind had been at the time, because the events had happened eight months ago, except that he was "having to follow orders," and felt he "had no choice."  He usually followed orders from people he recognized as having authority.  All the people he obeyed in the military had some type of insignia or uniform.  If someone of a lower rank told him to do something, he would know if they had the authority.  The two strangers, however, acted like they were in authority, so he followed their orders.  He did not recall either men making or receiving a cell phone call.  He left with them.  The whole incident from the time the two men arrived until he left with them took about three minutes, because it took him a while to wrap up the cord to the laptop.  They did ask him if the things on another table were his, and he said, "no."

Defendant testified he took pictures of the aquarium, because about every two to three months, the staff changed the fish.  Sometimes the fish were unusual, but he was not sure if they were on this occasion.  He did not remember anything in the aquarium.  He believed there were colored rocks, an "air bubbler," and a light on top.  The entire picture he took was of the aquarium, so if anything else was in the pictures it would have been photographed through the aquarium.  Further, no one had asked him not to take pictures, and he had taken  pictures of the aquarium

before.

### III. Discussion

### A. Consensual Encounter

The Fourth Amendment provides that "[t]he right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Constitutional Amen. IV. Warrantless seizures are "*per se* unreasonable under the Fourth Amendment, subject to only a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347 (1967).

The United States first argues that this matter does not involve a seizure or detention at all, but instead was a consensual "police-citizen encounter." The Fourth Amendment is not implicated in a police-citizen encounter, where law enforcement officers approach someone in a public place and speak with him or her or ask the person to answer a few questions. Florida v. Bostick, 501 U.S. 429 (1991); Florida v. Royer, 460 U.S. 491 (1983); United States v. Weaver, 282 F.3d 302 (4th Cir. 2002), cert. denied, 537 U.S. 847 (2002); United States v. Flowers, 912 F.2d 707 (4th Cir. 1990). However, the Fourth Amendment is implicated once an individual has been "seized" - - that is, when the subject is no longer "free to leave." Michigan v. Chesternut, 486 U.S. 567 (1988); Immigration & Naturalization Serv. v. Delgado, 466 U.S. 210 (1984); United States v. Mendenhall, 446 U.S. 544 (1980); United States v. Sullivan, 138 F.3d 126 (4th Cir. 1998); United States v. Lattimore, 87 F.3d 647 (4th Cir. 1996) (*en banc*). "Generally speaking, a 'seizure' warranting protection of the Fourth Amendment occurs when, in the view of the totality of the circumstances surrounding the 'stop,' a reasonable person would not feel free to leave or otherwise terminate the

encounter." <u>Weaver</u>, 282 F.3d at 309-10.  <u>See also</u> <u>Sullivan</u>, 138 F.3d at 133; <u>Lattimore</u>, 87 F.3d at 653; <u>United States v. Wilson</u>, 953 F.2d 116 (4th Cir. 1991); <u>United States v. Gray</u>, 883 F.2d 320, 322 (4th Cir.. 1989); and <u>United States v. Alpert</u>, 816 F.2d 958 (4th Cir. 1987).

The district court's determination of whether a seizure occurred is factual in nature and will be overturned on appeal only if clearly erroneous.  <u>Wilson</u>, 895 F.2d at 172; <u>Gordon</u>, 895 F.2d at 937-38; <u>United States v. Clark</u>, 891 F.2d 501 (4th Cir. 1989).

As the defendant in <u>Wilson</u> argued, Cameron here argues that: "1) the initial stop constituted a seizure without the requisite 'articulable suspicion,'" and therefore the consent to search and statement and all that flowed from them was non-consensual and unjustified.  "Although a 'reasonable articulable suspicion' is required prior to an investigatory detention, the requirement only applies if a 'seizure' has occurred."  "'Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons.  Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."  "The standard adopted by the Supreme Court to determine whether a 'seizure' has occurred is an objective one-an individual is seized 'only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'"  "The agents' conduct must be measured according to the probable perspective of a reasonable person, ***not the subjective perception of the particular Defendant***."  <u>United States v. Wilson</u>, <u>supra</u> at 170 (internal citations omitted)(emphasis added by the undersigned).

There is no factual dispute that the encounter between the two policemen, Matheny and Erdie, and Cameron took place in a public place, the Taylor County Public Library.  <u>Florida v. Bostick</u>, *supra.*

The police had a right to approach Cameron in the library, once he had been pointed out as the person who had been taking pictures of the child, and ask him if he had taken pictures of a child after being told not to.  Id.

However, Cameron disputes that the police approached him in the library and asked him questions about photographing a child.  Instead, his version of the events is essentially: 1)While he was sitting at a library table reading emails on his laptop computer, two men in brown suits entered the door and came over to him and ordered him to close his laptop, unplug it, put it in its case, and go with them. 2) He did what he was told without asking any questions or for any identification. 3) When he tried to put his laptop computer in his own vehicle, he was told to remove it and bring it to another car and to get into the back of that car which again he did without asking any questions. 4) He had no recollection of the car he got in being a police car.  5) The strangers he accompanied out of the library never told him they were police, did not lay hands on him and he did not see any guns on them.  6) When he left the library in the company of the two strangers, he had no idea where they were taking him because they had not told him and he had not asked. 7) Cameron tried to explain his behavior in going with complete strangers to an unknown destination stating his thinking as: "What the heck? A new adventure," and I "had nothing else to do."   When asked if he had any idea why two strangers would approach him in the public library and order him to go with them, Cameron hesitated and then explained: "I'm not sure.  People do things weird all the time.  It's been my experience that people do weird things.  You watch television and things like this happen all the time.  Officers, FBI agents come up and drag you off."

Cameron repeatedly stated that he was ordered to go with the men and that he knew an order when he heard one because he had been in the military for 20 years.  Cameron's assertion raises a

two issues.  First, it must be determined whether Cameron's assertion that he was ordered is credible.  Second, the undersigned must also consider whether a reasonable person under a totality of the circumstances surrounding the encounter "would have believed that he was not free to leave." Id.

In assessing the credibility of the witnesses' versions of the events at the Public Library, the undersigned is entitled to,  and did consider:  each witness'  intelligence, motive, state of mind, and demeanor and manner while on the stand;  any relation each witness may bear to either side of the case; the manner in which each witness might be affected by the outcome; the extent to which, if at all,  each witness is either supported or contradicted by other evidence in the case; the inconsistencies or discrepancies in the testimony of a witness, or between the testimony of different witnesses;  that two or more persons witnessing an incident or a transaction may see or hear it differently or have an innocent mis- recollection or like failure of recollection and consider whether it pertains to a matter of importance or an unimportant detail and whether the discrepancy results from innocent error or intentional falsehood; whether a witness previously made statements which are inconsistent with his or her present testimony; and whether a witness has been shown to have knowingly testified falsely concerning any material matter, or conducted himself or herself in a manner that indicates a propensity to lie, or involves some element of deceit or untruthfulness.   In the process, the undersigned did not treat the testimony of the law enforcement officers who testified differently than any other witness but instead subjected their testimony and evidence to the same scrutiny and the same tests as applied to the testimony and evidence of any other witness, including but not limited to their demeanor on the stand, their manner of testifying, and the substance of their testimony. The undersigned did not necessarily determine the weight of the evidence by the number

of witnesses testifying.  Instead, the undersigned  considered  all the facts and circumstances in evidence to determine which of the witnesses were worthy of greater credence or believability.

In conducting the required analysis, the undersigned would note that officers Matheny and Erdie had just arrived for duty at a shift change.  It is not believable that they both would have been dressed in brown business suits similar to what lawyers wear as testified to by Cameron.  It is more believable and the undersigned finds by a preponderance of the credible evidence that they were dressed in their city police uniforms and both were equipped with sidearms and other gear ordinarily carried by police on their belts.  The undersigned further finds by a preponderance of the credible evidence that the two officers were driving the Jeep Cherokee police vehicle they testified they were driving.

While Sgt. Holcomb experienced "red flags" when he heard of a man taking pictures of a child at the same time he was working at his desk on his first child pornography case (the Vannoy case), the undersigned finds by a preponderance of the credible evidence that there is nothing to suggest that Holcomb told Matheny or Erdie of his concerns at any time prior to Cameron's leaving the library with the officers.  The undersigned finds by a preponderance of the credible evidence there is also nothing to suggest that Matheny or Erdie had made any connection between the Vannoy case and their being instructed to go over to the public library to find out what was going on there.

It is not believable that a 307 pound adult man would, without questions,  pack up his personal belongs and go from a public library to whereabouts unknown at the request of two unidentified and strangers.  The undersigned finds by a preponderance of the credible evidence that officers Matheny and Erdie were in uniform, armed and driving the Grafton City Police Jeep Cherokee vehicle to the library where Matheny asked Cameron if he had taken pictures of a girl in

the library after he was told not to.  Cameron admits to taking two pictures of the fish aquarium inside of the library but does not know if the pictures encompassed the girl because he did not look at the pictures after he took them on his digital camera.[1]  The undersigned finds by a preponderance of the credible evidence that as a result of Cameron telling him that he did not take pictures of the girl, Matheny called Sgt. Holcomb for further instructions.

The undersigned further finds by a preponderance of the credible evidence  that Matheny understood Holcomb to instruct him to ask Cameron if he would come down to the station house because Holcomb wanted to talk to him.  In making this finding, the undersigned has considered and dismissed as poor choice of wording and "police speak"[2] the affidavit and report of Holcomb where in multiple places within each document he avers and states he had ordered Cameron detained and that Cameron had been detained and brought from the library to the station house.  The affidavit and report were prepared after Cameron came from the library to the station house, and after he signed the consent to search at the station house and made the statement at the station house that they would find pictures of child pornography.  Moreover, Holcomb was not present at the library and had no idea of what Matheny said to Cameron.  Accordingly, Holcomb's statements and averments in the report and affidavit are not attributable to Matheny.  Even if it is believed that Holcomb instructed Matheny to detain Cameron, it is obvious to the undersigned from the testimony of both Matheny and Erdie, that Matheny did not do as he was told.   Both Matheny and Erdie were present at the

---

[1]One of the benefits of the digital camera is the ability to immediately see the photograph just taken and to delete or keep it rather than waiting for film to be sent to a lab and developed.

[2]Police offices must be careful in the use of words of art as they have specific meanings in the law and should not be loosely utilized.  This is particularly true in any affidavit in which the officer is swearing to information he or she wants an impartial judicial officer to consider and act on.

library and corroborate each other's testimony that Matheny asked Cameron if he would go to the station house to talk to Sgt. Holcomb. Both Matheny and Erdie confirm that Cameron started packing up his computer, camera and other personal belongings and said: "Sure, where we going?"

In Cameron's selective recollection of events, he specifically recalls that his camera was already in the bag and not on the table and that he put his computer bag in his own vehicle first and was told to put it in the stranger's vehicle instead. However, he is unable to remember what kind of vehicle he was getting into or if the vehicle he was getting into was a police vehicle.

Cameron specifically states that the two men did not force him, and he didn't see guns. Matheny and Erdie corroborate this statement. Each of the officers testified that neither of them ordered Defendant to do anything; neither laid hands on Defendant; neither ever suggested Defendant was not free to leave; neither ever suggested he was required to talk to them; and neither ever restrained Defendant or prevented him from leaving. Both officers testified that Defendant never tried to leave. The officers did not even ask Defendant his name or ask him to produce identification. They did not search him or his bag prior to him getting in the Jeep. They had no way of knowing if he was armed when he was riding behind them in the Jeep. They did not hand cuff him prior to letting him sit behind them in the back seat of the Jeep. Such actions by the police, which would constitute a ludicrous violation of common sense safety in transporting a detained suspect, are indicative of and consistent with all parties believing this was nothing more than a consensual encounter with and transport of Cameron from the library. Cameron's own statement of his motivation at the time for going with the two strangers: "What the heck? A new adventure," and I "had nothing else to do" is totally consistent with the consensual nature of the whole encounter.

In summary based on the totality of the credible evidence, the undersigned concludes that Cameron voluntarily consented to leaving the library and entering the police Jeep to be transported for a meeting with Sgt. Holcomb. Based on a totality of the evidence surrounding the encounter at the library and from the library to the police interview room, the undersigned concludes that the ordinary reasonable person would have believed that he was free to leave.

Once at the police station, Cameron was directed to an interview room and left there with his yet to be searched belongings. The door to the room was left open. No one stayed in the room with him. He was left there alone while Matheny told Holcomb that he was there. That is when Holcomb instructed Matheny to see if Cameron would sign a consent form. Matheny took the form to Cameron and the parties all agree that Cameron signed it. Once again, the undersigned concludes from a totality of the circumstances surrounding the incident that the ordinary reasonable person would have believed that he was free to leave.

In summary, at no time was there a 'seizure' of Cameron warranting protection of the Fourth Amendment. At no time in the continuum between arrival of the police at the library and the signing of the consent form in the police station does the totality of the circumstances surrounding the police contact with Cameron suggest that a reasonable person in Cameron's shoes would not have felt "free to leave or otherwise terminate the encounter." <u>Weaver</u>, <u>Sullivan</u>, <u>Lattimore</u>, <u>Wilson, Gray, Alpert</u>, *supra*.

### B. <u>**Terry**</u> **Stop**

The United States argues that, even if the encounter is found to be non-consensual, the officers would have been justified in detaining Defendant for the purpose of investigating the situation. An officer may stop and briefly detain a person for investigative purposes (known as an

investigative or <u>Terry</u> stop) when there is "reasonable suspicion," based on articulable facts, that criminal activity is afoot. <u>United States v. Sokolow</u>, 490 U.S. 1, 7 (1989); <u>Terry v. Ohio</u>, 392 U.S. 1, 30 (1968). Whether there is reasonable suspicion depends on the totality of the circumstances, including the information known to the officer and any reasonable inferences to be drawn at the time of the stop. <u>United States v. Arvizu</u>, 544 U.S. 266 (2002); <u>United States v. Crittendon</u>, 883 F.2d 326 (4th Cir. 1989).

The legitimacy of an investigative stop thus turns on what constitutes "reasonable suspicion," which the Fourth Circuit has called "a common-sensical proposition . . . [properly] crediting the practical experience of officers who observe on a daily basis what transpires on the street." <u>United States v. Lender</u>, 985 F.2d 151 (4th Cir. 1993). <u>Accord</u> <u>Arvizu</u>, 544 U.S. at 273.

Because the intrusion created by an investigative stop is minimal, the reasonable suspicion standard is not onerous. <u>See</u>, <u>e.g.</u>, <u>United States v. Harris</u>, 39 F.3d 1262 (4th Cir. 1994); <u>United States v. Turner</u>, 933 F.2d 240 (4th Cir. 1991); and <u>United States v. Moore</u>, 817 F.2d 1105 (4th Cir. 1987).

On the other hand, an officer's reliance on a "mere hunch," is not sufficient to establish reasonable suspicion. <u>Arvizu</u>, <u>supra</u>, at 274; <u>United States v. Sprinkle</u>, 106 F.3d 613 (4th Cir. 1997)("reasonable suspicion" must include "particularized evidence that . . . criminal activity is afoot," finding government's showing lacking on the facts of that case).

Absent probable cause to arrest, only brief investigative detention is permitted under a <u>Terry</u> stop. Thus, there are cases in which a defendant contends either that a <u>Terry</u> stop was, in fact, an arrest without probable cause, or that a proper <u>Terry</u> stop escalated into an arrest without probable cause.

The fact or perception of a subject that he is not "free to leave," standing alone, is insufficient to convert a Terry stop into an arrest. Leshuk, supra, at 1109-10. On the other hand, at some point what began as investigative detention during a Terry stop becomes too long and therefore escalates into a de facto arrest. However, the point at which this occurs is not subject to "a hard and fast time limit," United States v. Sharpe, 470 U.S. 675 (1985), but must be determined on a case by case basis.

Miranda warnings are not required when a person is questioned during a Terry stop. United Sates v. Leshuk, 65 F.3d 1105 (4th Cir. 1995).

A trial court's determination of "reasonable suspicion" is reviewed de novo; however, the appellate court should "give due weight to inference draw from the facts by resident judges and local law enforcement officers." Ornelas v. United States, 517 U.S. 690 (1996). Accord Arvizu, supra at 274-275; and Lender, supra at 154.

In the instant case, the undersigned does not reach the issue of whether the police possessed reasonable articulable suspicion sufficient to justify a Terry stop because the undersigned has concluded that the police encounter with Cameron from within the library to the police station was consensual.

### C. Consent

A search conducted pursuant to valid consent is a well-recognized exception to the Fourth Amendment's general warrant requirement. Schneckloth v. Bustamonte, 412 U.S. 218 (1973). Whether consent to search was given is a factual issue to be determined by this Court in light of all the circumstances. United States v. Mendenhall, 446 U.S. 544, 557, 100 S.Ct. 1870, 1879, 64 L.Ed.2d 497 (1980). United States v. Vickers, 387 F.2d 703 (4th Cir. 1967) citing Channel v. United States, 285 F.2d 217 (4th Cir. 1960), United States v. Rusher, 966 F.2d 868 (4th Cir. 1992).

That factual determination will not be disturbed unless it is clearly erroneous. <u>United States v. Gordon</u>, 895 F.2d 923, 938 (4th Cir). The government bears the burden of proving consent was given for the search. <u>United States v. Vickers</u>, <u>supra</u>, <u>citing</u> <u>Wren v. United States</u>, 352 F.2d 617 (10th Cir. 1965).

If challenged, the district court must determine, based upon the "totality of the circumstances," whether consent was knowing and voluntary, which the government must prove by a preponderance of the evidence. <u>See</u>, <u>e.g.</u>, <u>United States v. Mendenhall</u>, 446 U.S. 544 (1980) <u>United States v. Boone</u>, 245 F.3d 352 (4th Cir. 2001); <u>United States v. Brugal</u>, 209 F.3d 353 (4th Cir. 2000); <u>United States v. Elie</u>, 111 F.3d 1135 (4th Cir. 1997); and <u>United States v. Lattimore</u>, 87 F.3d 647 (4th Cir. 1996).

In <u>Elie</u>, the Fourth Circuit again noted the factors to be considered in determining whether . . . consent to search was freely and voluntarily given":

> [I]t is appropriate to consider the characteristics of the accused (such as age, maturity, education, intelligence, and experience) as well as the conditions under which the consent to search was given (such as the officer's conduct; the number of officers present; and the duration, location, and time of the encounter.

111 F.3d at 1144. "*Written* consent supports a finding that consent was voluntary." <u>Boone</u>, 245 F.3d at 662 (emphasis added), <u>citing</u> <u>United States v. Navarro</u>, 90 F.3d 1245 (7th cir. 1996).

Although consent must be knowing and voluntary, the government is not required to show that an individual was told or otherwise knew he had the right to refuse consent. <u>See</u>, <u>e.g.</u>, <u>Ohio v. Robinette</u>, 519 U.S. 33. "Neither the drawing of a gun by an arresting officer, nor the handcuffing of the accused establishes involuntariness in an d of itself." <u>Elie</u>, <u>supra</u> at 1145-1146.

On the other hand, consent must be more than mere acquiescence to apparently lawful authority. <u>Compare</u>, <u>e.g.</u>, <u>Bumper v. North Carolina</u>, 391 U.S. 543 (1968)(no consent to search if

only acquiescence to apparently lawful authority); Lattimore, 87 F.3d at 652 (but for defendant's prior consent to search, state trooper's unfounded threat to call a drug dog . . . raise[s] serious questions concerning the voluntariness of his consent"); and United States v. Smith, 30 F.3d 568 (4th Cir. 1994) (unlocking car door and appearing cooperative with police sufficient evidence of consent, rejecting defendant's argument that cooperation was motivated by fear of police).

In the instant case, the parties at the outset of the evidentiary hearing concurred that any disposal of the suppression motion on either the consensual encounter basis or the Terry stop basis rendered any issue of the voluntariness of the consent signed by Cameron in the police station and any evidence, including any oral statement, obtained as a result moot.

## IV.

For the reasons herein stated, the undersigned accordingly recommends Defendant's Motion to Suppress [Docket Entry 17] be DENIED.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Proposed Findings of Fact and Recommendation for Disposition set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such proposed findings and recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to

counsel of record.

Respectfully submitted this 18 day of April, 2008.

*John S. Kaull*

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE