**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

**v.**                      //      **CRIMINAL ACTION NO. 1:08C21**
                                                             (Judge Keeley)

**DAVID CAMERON,**

    **Defendant.**

**ORDER ADOPTING REPORT AND RECOMMENDATION
AND DENYING MOTION TO SUPPRESS**

Before this Court is the defendant David Cameron's ("Cameron") motion to suppress all evidence obtained during an encounter between Cameron and certain police officers on August 22, 2007 at or near Grafton, West Virginia. For the reasons that follow, the Court **ADOPTS** the Report and Recommendation ("R&R") and **DENIES** the motion.

## I. Procedural Posture

On April 3, 2008, Cameron filed a motion to suppress certain evidence. After this Court referred the motion to United States Magistrate Judge John S. Kaull for a hearing and Report and Recommendation ("R&R"), on April 15, 2008, Magistrate Judge Kaull conducted an evidentiary hearing on the motion. On April 18, 2008, he filed an extensive twenty-eight page R&R recommending that this Court deny the motion to suppress.

On April 18, 2008, Cameron filed objections to the R&R. The government filed a response on May 8, 2008. On May 12, 2008, this Court received a transcript of the hearing conducted by Magistrate

**ORDER ADOPTING REPORT AND RECOMMENDATION
AND DENYING MOTION TO SUPPRESS**

Judge Kaull. The matter is now fully briefed and ripe for consideration.

## II. Legal Standard

A court reviews any part of an R&R to which a party objects <u>de novo</u> but may adopt any portion of an R&R to which no party objects without substantive review.[1]

Warrantless searches are "<u>per se</u> unreasonable under the Fourth Amendment, subject to only a few specifically established and well-delineated exceptions." <u>Katz v. United States</u>, 389 U.S. 347 (1967). Consensual "police-citizen encounters" are not governed by the Fourth Amendment when law enforcement officers approach someone in a public place and either speak with that person or ask them to answer questions. <u>Florida v. Bostick</u>, 501 U.S. 429 (1991). Once a person has been seized and is no longer free to leave, however, the Fourth Amendment becomes relevant. <u>Michigan v. Chesternut</u>, 486 U.S. 467 (1988). "Generally speaking, a `seizure' warranting protection of the Fourth Amendment occurs when, in the view of the totality of the circumstances surrounding the `stop,' a reasonable

---

[1] A party's failure to object to a portion of the Report and Recommendation not only waives their appellate rights on that issue, but also relieves the Court of any obligation to conduct a <u>de novo</u> review of the issue presented. <u>See</u> <u>Thomas v. Arn</u>, 474 U.S. 140, 148-153 (1985); <u>Wells v. Shriners Hosp.</u>, 109 F.3d 198, 199-200 (4th Cir. 1997).

person would not feel free to leave or otherwise terminate the encounter." United States v. Weaver, 282 F.3d 302, 309-10 (4th Cir. 2002). The standard is objective and the subjective perception of a particular defendant is not relevant. United States v. Wilson, 953 F.2d 116, 170 (4th Cir. 1991). To the extent seizure is a question of fact, it is reviewed by the Fourth Circuit for clear error. United States v. Black, ___ F.3d ___, 2008 WL 2042612, *4 (4th Cir. 2008). To the extent the seizure involves legal determinations on the basis of those facts, the review is de novo. Id.

**III. Analysis**

Cameron asks this Court to conduct a de novo review, including an evidentiary hearing, of the credibility of the witnesses who testified at the hearing. In light of the extensive evidentiary proceeding over which Magistrate Judge Kaull presided, another hearing would not aid the Court since there is an adequate record from which to weigh the credibility of the witnesses and rule on the defendant's objections.

The government and Cameron both agree that this motion turns on an assessment of credibility. If the Court finds that the police officers' account of events is credible, then it should deny the motion. If Cameron's version of events is credible, however, then it should grant the motion and suppress the evidence.

USA V. CAMERON                                                  1:08CR21

**ORDER ADOPTING REPORT AND RECOMMENDATION
AND DENYING MOTION TO SUPPRESS**

After conducting a de novo review of Cameron's objections, as well as considering the government's response, the transcript of the hearing and an audio recording of the hearing, the Court finds that the police officers' version of events is more credible. Although the parties agree that the encounter between Cameron and the police officers began on August 22, 2007 in a public place, the Taylor County Public Library, Tr. 10-11, 54, 86, there are very little else that is not disputed.

A.  Witness Testimony

1.  Officer Matheny

According to the testimony of Grafton Police Department Officer David Matheny ("Matheny"), on August 22, 2007, he received a non-emergency telephone call at the police station from an employee at the Taylor County Public Library indicating that a man was in the library taking pictures of a child against the wishes of the child and the child's mother. Tr. 10, 20. This telephone call was not recorded. Tr. 28. After Matheny told Grafton Police Sergeant David Holcomb ("Holcomb") about the telephone call, Holcomb instructed Matheny to go to the library to gather more information. Tr. 10-11. Grafton Police Department Officer Christopher Erdie ("Erdie") and Matheny then drove to the library and arrived within a few minutes. Tr. 11. During the trip, they did not turn on the emergency lights or siren on their police

cruiser and did not exceed the normal speed limit. Tr. 30. Both Matheny and Erdie were wearing their police uniforms with sidearms at the time. Tr. 22.

When Matheny arrived, he saw two men in the library; Erdie meanwhile spoke with the mother to determine which man was taking photos of her child. Tr. 11. The mother identified Cameron. Tr. 11. When the officers approached Cameron, he was seated at a table working with a laptop computer. Tr. 12. He closed the laptop as the police approached. Tr. 13. There was also a digital camera on the table. Tr. 31. The officers asked Cameron if he had been taking pictures of a child and Cameron denied the allegation. Tr. 12.

At that point, Matheny called Holcomb for further direction. Tr. 12. Holcomb instructed him to ask Cameron if he would voluntarily come to the police department. Tr. 12. Holcomb did not tell Matheny to detain Cameron. Tr. 24. Specifically, Matheny remembers saying to Cameron: "Sir, my Sergeant would like to speak with you, if you would, would you come to the police department with me?" Tr. 14. To this, Cameron replied: "Sure, where are we going?" and began to secure his belongings. Tr. 14. At no time did Cameron protest, resist or attempt to terminate the encounter. Tr. 14. Matheny did not sense any reluctance on Cameron's part to come with him and Erdie. Tr. 15. Matheny never told him that he

**ORDER ADOPTING REPORT AND RECOMMENDATION
AND DENYING MOTION TO SUPPRESS**

was not free to leave; nor did he physically touch Cameron or his possessions. Tr. 15. At no time did Matheny or Erdie search Cameron or his possessions. Tr. 15. Cameron was not handcuffed and the police did not ask him for photo identification. Tr. 26, 38.

Cameron walked out to and entered the police cruiser without attempting to walk anywhere else first. Tr. 25. Matheny did not know that Cameron had a vehicle parked at the library until after they had reached the police station. Tr. 26. As they were traveling to the police station in the police cruiser, Cameron began fumbling in his bag and Matheny asked him not to touch his bag. Tr. 15. According to Matheny, he said this because he had not searched the bag and did not know if it contained a weapon. Tr. 15.

Two or three minutes later, the officers and Cameron reached the police station. Tr. 16. Matheny opened the door to the cruiser and Cameron got out. Tr. 16. Matheny pointed Cameron in the direction of a room in the police station and asked him if he would wait there until Holcomb was ready to speak with him. Tr. 40. The door to the room was left open and neither Cameron nor his possessions had been searched at that point. Tr. 40.

After Matheny told Holcomb that Cameron had arrived, Holcomb told Matheny to ask Cameron to sign a Consent to Search form so

6

that they could look at the photos on his digital camera.  Tr. 41.  Matheny did so and Cameron then signed the form.  Tr 41.

2.  Officer Erdie

Erdie's account of events closely mirrors that of Matheny.  After Matheny received the telephone call, Erdie accompanied him in the police cruiser to the library.  Tr. 44.  They were both wearing uniforms and sidearms at the time.  Tr. 50.  Upon entering the library, Erdie located the mother of the child and spoke with her.  Tr. 45.  She identified Cameron as the person who had been taking photos of her child.  Tr. 45.

The police officers approached Cameron, who closed his laptop as they approached.  Tr. 45.  There was also a digital camera on the table at the time.  Tr. 46.  Matheny asked Cameron if he had been taking pictures of the child and Cameron said no.  Tr. 45.  At that point, Matheny called Holcomb to request further instructions.  Tr. 46.

After speaking to Holcomb, Matheny asked Cameron if he would mind coming to the office to speak with the sergeant.  Tr. 47.  Cameron said "Okay," packed his belongings, and walked outside with the police officers to the cruiser.  Tr. 47.

Neither officer ever commanded or ordered Cameron to do anything.  Tr. 46.  The officers never laid hands on Cameron.  Tr. 46.  Erdie never indicated that Cameron was not free to leave, nor

7

did he tell Cameron that he would be required to talk with the police or submit to an interview. Tr. 47. They also did not explicitly tell him that he was free not to go with them. Tr. 49.

Cameron walked directly to the police car and entered the back seat without attempting to go elsewhere. Tr. 50. After arriving at the police station, he walked in with the officers. Tr. 50. Once inside the station, the officers directed Cameron to wait in an interview room. Tr. 51. Although the door was open, Cameron did not attempt to leave. Tr. 51. Had he attempted to leave, Erdie would have let Cameron go because he was not detained. Tr. 51.

3. Sergeant Holcomb

According to Holcomb, on August 22, 2007, Matheny received a telephone call at the police station about an individual at the public library taking unwanted photographs of a child. Tr. 54. Holcomb directed Matheny "to take the call and see what was going on." Tr. 55. Matheny, accompanied by Erdie, left for the library. Tr. 57. At the time, Holcomb was working on another child pornography case. Tr. 55. Holcomb suspected at the time that Cameron might be a person somehow associated with that other case. Tr. 56.

Later, Matheny called Holcomb from the library. Tr. 57. After hearing that Cameron had a laptop and a digital camera,

Holcomb became more suspicious and asked Matheny to see if Cameron would come to the station and talk to him. Tr. 58. He specifically told Matheny to ask Cameron, and not to detain him. Tr. 60.

When Cameron and the officers arrived at the station a few minutes later, Cameron was shown into a room and asked to wait. Tr. 59. Cameron had his possessions with him and the door to the room remained open. Tr. 59. After that, Cameron signed a Consent to Search form. Tr. 60. Holcomb acknowledged that his affidavit of the events used the word "detain" but he stated that it was a poor word choice and that Cameron was never actually detained. Tr. 60. He acknowledged that this was a discrepancy between the affidavit and his testimony. Tr. 64. He also acknowledged using the word "detain" in a police report. Tr. 65.

4. David Cameron

Cameron testified that he was approached in the library by two men wearing brown suits, not police uniforms, who ordered him to close his laptop, unplug it, put it in the case, and follow them. Tr. 86, 91, 93. His digital camera was inside the laptop case and was not in plain view at that time. Tr. 89. Although Cameron asserted that he only took pictures of the aquarium and did so because he was interested in fish, he could not recall anything about the fish in the aquarium that day. Tr. 102. He is unsure

**ORDER ADOPTING REPORT AND RECOMMENDATION
AND DENYING MOTION TO SUPPRESS**

whether the men he encountered were Matheny and Erdie. Tr. 95. He does not recall them making a telephone call in his presence. Tr. 100. The men did not indicate to Cameron that he had an option not to go with them and Cameron believed he had been ordered to do so. Tr. 86. Cameron obeyed them because they acted like persons of authority. Tr. 92. He also thought that this could be "a new adventure." Tr. 93. He also "didn't have anything else to do." Tr. 92. Also, "[p]eople do things weird all the time. It's been my experience that people do weird things. You watch on the television all the time and things like this happen, regularly on television. [People] come up and drag you off." Tr. 98.

From the time the strangers approached Cameron to when he left the library with them took less than three minutes. Tr. 100. As they walked out of the library, Cameron was not handcuffed, nor did they touch him until they helped him out of the vehicle at the police station. Tr. 98. He attempted to put his computer in his car, but the men told him to bring the laptop with him to their car. Tr. 87. He complied because he felt he had no choice. Tr. 87. They told him to get in the back of the car and he did so. Tr. 88. He cannot remember anything about the car, not even the color. Tr. 97. He became concerned that his laptop was still on and that the battery would run down. Tr. 88. When Cameron started

to dig around in his bag to turn off the computer, his companions told him to close the case and he complied. Tr. 88.

They arrived at the building that houses both the Grafton Fire Department and Grafton Police Station. Tr. 88. The men escorted Cameron to a room that looked like a break room containing a coffee pot and some other things. Tr. 88. They told him to sit at the table. Tr. 88. He did not offer any testimony as to what happened after that point.

B. Credibility

The parties agree that what occurred after the Consent to Search form was signed was a consensual search. They disagree on whether the events prior to that consent amount to an unconstitutional seizure. The outcome of this motion hinges entirely on the credibility of the witnesses concerning what actually happened on August 22, 2007.

This Court finds that the police officer's recollection of events is more credible than that of Cameron. It finds that Matheny and Erdie were dressed in police uniforms, not brown suits as alleged by Cameron. It is not believable that two officers dispatched from the police station after receiving a call from the library would not be wearing their usual police uniforms and carrying their usual police equipment during work hours. It is also more credible to believe that they were driving a marked

police car rather than an unmarked vehicle. As Magistrate Judge Kaull found in his R&R, there is no evidence to suggest that prior to the time Cameron arrived at the police station, Holcomb told either Matheny or Erdie about his concerns regarding a man taking pictures of a child. Rather, he directed Matheny to go check out the circumstances of the complaint from the library. It is not reasonable to believe that a large man, weighing over three hundred pounds, would pack his belongings and leave a public library to go to an unknown location simply because two strangers in brown suits ordered him to. It is more credible to believe that two police officers in uniform approached Cameron, asked him if he had taken any pictures of a little girl, which he denied. It is also more credible to believe that Matheny then telephoned Holcomb, who instructed Matheny to ask Cameron to come to the police station.

Cameron does not recall a telephone call. Nor can he identify the officers as the men he encountered in the library. He cannot remember anything about the officers' vehicle, not even the color. He cannot recall anything about the fish in the aquarium, despite testifying that he took pictures of the aquarium because he is interested in fish.

As did Magistrate Judge Kaull in his R&R, this Court finds that Holcomb used a poor choice of words and engaged in "police speak" when he stated in his affidavit that Cameron had been

detained. That affidavit was drafted after Cameron had already entered the police station, had signed the consent form, and had been searched pursuant to that consent. Furthermore, it was Officers Matheny and Erdie, not Holcomb, who brought Cameron to the police station. The legal test to determine whether a person is detained is an objective standard. <u>Wilson</u>, 953 F.2d at 170. Therefore, merely because Holcomb said, or even believed, that Cameron was detained doesn't end the inquiry.

Although there are very few undisputed facts in this case, those that are undisputed are significant. It is undisputed, for example, that Cameron was not handcuffed and that the officers did not physically touch him, except to help him out of the car at the police station. It is also undisputed that he was not searched prior to executing the consent form. Given all this, as well as the inconsistencies and improbabilities in Cameron's story, the officers' testimony that they asked him to accompany them to the police station to talk to their sergeant is more credible. The Court, therefore, finds by a preponderance of the evidence that Cameron voluntarily complied with the request of Matheny and Erdie to accompany them to the police station.

The Court also credits the testimony of the officers that they never ordered Cameron to do anything, never suggested that he was not free to leave, nor restrained him or otherwise prevented him

from leaving. As Magistrate Judge Kaull concluded, even Cameron's own testimony indicates that the encounter was consensual. He went with Matheny and Erdie because he had nothing better to do and he thought this might be a new adventure. In short, the entire encounter between Cameron and the police officers was consensual. Moreover, the totality of the circumstances surrounding Cameron's contact with the police officers would not have indicated to a reasonable person that he was not free to leave or otherwise terminate the encounter. Furthermore, the police were under no obligation to advise him that he was free to leave.

## IV. Conclusion

Upon <u>de novo</u> review, the Court finds that the entire encounter between the police officers and Cameron was consensual and that a reasonable person would not have felt that he was restrained and could not leave or otherwise terminate the encounter. It therefore **ADOPTS** the Report and Recommendation in its entirety (dkt. no. 26) and **DENIES** the motion (dkt. no. 17).

It is so **ORDERED.**

The Clerk is directed to mail a copy of this Order to the petitioners, certified mail, return receipt requested.

Dated: May 30, 2008.

/s/ Irene M. Keeley
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE